ESTATE OF EFFIE ANDREWS, JAMES M. ANDREWS, AND ALICE F. CHAMBERLAIN, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 13096.   Promulgated September 28, 1928.

*Leon R. Jillson, Esq.*, for the petitioners.
*Frank S. Easby-Smith, Esq.*, for the respondent.

**OPINION.**

ARUNDELL: In support of their claim for a lower valuation on the 6 per cent mortgage bonds of the Madison Avenue Offices, Inc., the petitioners presented the oral testimony of two witnesses with considerable experience in the appraisal of stocks and bonds, and also, by agreement of counsel for the parties, introduced into the record the affidavits of the president of the Madison Avenue Offices, Inc., and an experienced bond salesman. The witnesses testified to values ranging from $35,000 to $66,000. One of the deponents expressed the opinion that $80,000 represented a fair value for the securities and the other deponent was of the belief that the sum was more than the bonds could be sold for. After a careful consideration of all the evidence presented on the question, we have reached the conclusion that the value as returned originally by petitioner in the amount of $79,920, which valuation was accepted by respondent, should not be disturbed.

The petitioners are contending for a valuation of $68,593.50 on the premises located at 48 West 57th Street. This figure is reached

by multiplying an assumed value of the decedent's undivided one-half interest in the property ($90,000) by the percentage of .76215 found in column 3 of Mortality Table A of estate tax regulations opposite age 74, to reduce the value of a remainder interest subject to a life estate to a present worth. While the respondent found the interest of the decedent to be worth $95,268.75 ($125,000 less a figure found by the use of the above mentioned percentage), he is now claiming that the evidence justifies a valuation of $100,000.

From a consideration of all the facts before us we have reached the conclusion that the cash price of $88,000, at which the decedent's interest in the property was sold to the owner of the other undivided one-half interest in January, 1925, about 14 months after the death of the decedent, represents the fair market value of the interest on October 28, 1923. This valuation is supported by the testimony of the petitioner's witness, an experienced appraiser of real estate, who appraised the property as a whole on April 30, 1924, as of October 28, 1923, at a figure of $200,000, and the decedent's one-half interest at $90,000, it being his practice to arbitrarily reduce the value of an undivided one-half interest in real property by a minimum of 10 per cent because of the greater difficulty of selling a part interest. The appraisal was based upon the condition of the real estate market in the fall of the year 1923, sales of property in the vicinity of the premises in question, and other pertinent facts. The evidence also tends to prove that there was little, if any, change in the value of the property between the time of decedent's death and the date of sale of the property.

The furniture and household goods of the estate were returned by the executors at a value of $9,086.87, the amount for which the property was sold to George D. Cochran, owner of the other one-half interest of the property and who had a life estate in the whole thereof, on April 12, 1926. We are satisfied from the evidence that this value should be accepted as the fair market value of the furniture at the time of the decedent's death.

The petitioners and respondent agree that the evidence of record establishes a value of $10,200 for the stock of the Schenectady Trust Co.

The remaining issue is that of whether the note found by the revenue officer among the effects of the decedent is a part of the estate. Counsel for the petitioners says that the substance of the issue is whether there was an actual consummation of the gift, and is of the opinion that there is some question as to whether the bonds were accepted by the decedent as security for the payment of the note or in extinguishment of the primary obligation. That the bonds were received by the decedent as collateral for the note is amply supported by the evidence. James M. Andrews testified that, knowing

the financial condition of the maker of the note, he suggested to his mother that she ought to have the promise to pay secured by collateral; that he negotiated with the treasurer of the church for the security and, after obtaining it, deposited the bonds in decedent's safe deposit box in the Guaranty Trust Co.  The decedent likewise thoroughly understood that the bonds were delivered to her to secure the payment of the note, for in the letter quoted in our findings of fact, the bonds are specifically referred to as "collateral for a loan." The manner in which the executors treated the instrument after its presence among the personal effects of the estate had been brought to their notice by the revenue agent indicates very strongly that they did not regard it as being a void or unenforceable paper or the property of the church, otherwise they would have delivered it to the church instead of to the recipient of the securities.  Alice Chamberlain not only testified that the bonds were delivered to the decedent as security for the payment of the note but the testimony tends to prove that she retained possession of the note after its delivery to her by the executors until the loan had been repaid in full.  We have been convinced without doubt that neither party to the original transaction intended that the bonds should represent more than security for the fulfillment of the promise to pay contained in the note.  Such being the case, the note, not the bonds, evidenced the debt.

We do not doubt that the decedent intended to make a gift to Alice F. Chamberlain of $60,000 or of something of equivalent value. She carried out her intention, or attempted to do so, by turning over the bonds she held as collateral security for the note.  Whether she could legally pass title to the bonds or violated the terms under which she held them as security, is not before us for determination.  Our only question is whether the decedent disposed of the note by gift so that at her death it was not a part of her estate.  Whether decedent intended to give Alice F. Chamberlain the note or something else of the value of $60,000 is not clear from the evidence.  All we have on this point is the testimony of decedent's son who says that his mother "wanted to make a gift to Miss Chamberlain of $60,000." Assuming, for the purpose of discussion, that she intended to give the note, there is lacking the essential element of delivery necessary to complete the gift.  It is well recognized in the law of gifts that physical delivery of the subject of the gift is not always indispensable, but there must be an actual delivery, as said in the frequently quoted statement from 2 Kent's Com. 439, "so far as the subject is capable of it."  In *Allen-West Commission Co.* v. *Grumbles*, 129 Fed. 287, 290, the rule is stated in this way:

If the subject of the gift is a chose in action, such as a bond, a note, or stock in a corporation, the delivery of the most effectual means of reducing the

chose to possession or use, such as the delivery of the bond, or the note, or the certificate of stock, *if present and capable of delivery, is indispensable* to the completion of the gift. (Italics ours.)

There is no contention here that the decedent did not have possession of the note or that it was incapable of delivery. It does appear that she had the note and could have delivered had she intended to do so.

We are aware that there are situations where a complete gift may be made by a written assignment or conveyance without manual delivery of the subject. But the rule applied in such cases is limited, and its limitations are set forth in the *Allen-West Commission* case, *supra*, as follows:

It is true that in cases where manual delivery of the subject of the gift, or of the evidences which command it, is impracticable or impossible, and in cases in which a written conveyance is the most effectual mode of divesting the donor of dominion and control of the thing, such a conveyance is sufficient. But it is equally true that a written assignment is utterly inadequate, where the delivery of the subject of the gift or the delivery of the evidences of it is practicable, and the latter is the more ready and efficient way of commanding the dominion and control of the subject of the gift.

After citing and discussing many cases the opinion continues with the following:

The clew to the labyrinth of decisions upon this subject is the reason of the rule which makes delivery of the thing, or of the most available means of commanding its dominion and control, indispensable to the validity of a gift. That reason is the imperative necessity of requiring the renunciation by the donor, not only of all possession, dominion, and control of the thing, but of all appearance thereof, lest by such an appearance he should lead creditors, purchasers, and others to believe, and to credit him in the belief, that he is the owner of that which in reality belongs to his donee, and lest by fraud and perjury gifts be proved which never in fact existed. *Yancey* v. *Field*, 85 Va. 756, 8 S. E. 721. This reason of the rule conditions the nature of the delivery it requires, and demands that the delivery shall, in every case, whether evidenced by written assignment or oral statement, consist as far as practicable of a delivery of that thing which will most effectually and irrevocably divest the donor of the dominion and the control of the subject of the gift, and thus of the appearance of title, whether that thing be the subject itself, a symbol of the subject, a written assignment of it, or the patent evidences of it whose delivery constitute the most effectual mode of transferring the dominion over it.

While the above quoted decision is not a New York case, we find upon investigation that the courts of that State hold the same way. See *Beaver* v. *Beaver*, 117 N. Y. 421; 22 N. E. 940; *In re Van Alstyne*, 207 N. Y. 298; 100 N. E. 802, and cases cited.

We repeat that we are not concerned with what the decedent did with the collateral security. The respondent has not attempted to include the collateral bonds in the estate. It is likewise of no concern what the executors did with the note if it was a part of the estate.

All that we have before us is whether the note to the extent of the value of the amount due on it is properly included in the estate. In our opinion the decedent failed to divest herself of her ownership of the note, even if it can be found that she intended to do so, which is doubtful, and the respondent properly included it in the assets of the estate at the value of $35,000, plus accumulated interest.

*Judgment will be entered under Rule 50.*